Norman J. MILLER, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.

Civ. A. No. 88–1083.

United States District Court, D. Kansas.

Dec. 8, 1988.

David H.M. Gray, Gragert, Hiebert, Gray & Woodring, Wichita, Kan., for plaintiff.

Stephen K. Lester, Asst. U.S. Atty., Wichita, Kan., for defendant.

## OPINION AND ORDER

THEIS, District Judge.

This is a proceeding under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Plaintiff filed an application for disability benefits under Title II. Tr. 78–81. The claim was denied initially, Tr. 82–86, and on reconsideration. Tr. 89–92. On September 1, 1987, following a hearing, an administrative law judge (ALJ) found that plaintiff was not under a disability as defined in the Social Security Act. Tr. 20–21. On January 25, 1988, after considering additional medical evidence, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Tr. 5–6. Thus, the decision of the ALJ stands as the final decision of the Secretary. The case is before the court on the Secretary's motion to affirm and the plaintiff's motion for summary judgment.

In his application for disability benefits, plaintiff stated that he was born on November 3, 1955, and alleged disability beginning December 30, 1985, due to mental problems. Tr. 78. A discharge summary from the Kansas Vocational Rehabilitation Center in Salina, Kansas, dated May 19, 1986, indicates that plaintiff had been evaluated for work adjustment training due to his mental retardation. His evaluators noted that plaintiff was friendly and cooperative, needed to improve his hygiene and grooming, and had difficulty keeping appointments. Work adjustment training was recommended. Tr. 115.

Plaintiff underwent a ten day vocational evaluation at the Occupational Center of Central Kansas, Inc., in Salina, Kansas. In the evaluation report dated May 28, 1986, Roxanne Atkinson, an evaluator technician, reported that plaintiff's work history included a job lasting nine years with the Association of Milk Producers, Inc., in Hillsboro, Kansas. Plaintiff's job duties were loading trucks, mowing grass, shoveling snow, and custodial work. Tr. 117.

During his exit interview at the Occupational Center, plaintiff agreed to further training and said that he liked to work. During testing, he exhibited good fine motor skills but his gross motor skills were deficient. Tr. 118. The Peabody Picture Vocabulary Test revealed that plaintiff had the vocabulary of an eleven year old (less than the 1st percentile). Tr. 119.

The Wide Range Achievement Test indicated that plaintiff could read at a 6.9 grade level (16th percentile), spell at a 6.9 grade level (25th percentile), and do math at a 4.6 grade level (14th percentile). Tr. 120. Plaintiff reported that he lived with his parents and said his household duties included cooking, shopping, doing laundry, and basic cleaning. Tr. 121. Results of the McCarron Dial Work Evaluation System indicated that plaintiff belonged in the "vocational program range of transitional sheltered employment." Atkinson noted that the transitional sheltered workshop was designed to provide temporary employment for individuals expected to move into competitive employment. Tr. 121. She recommended work adjustment training with an emphasis on personal appearance, social interactions, and job readiness skills. Tr. 123.

William T. Wright, Ph.D., a clinical psychologist, examined plaintiff on July 10, 1986. Testing revealed that plaintiff functioned at the borderline intellectual level. He had a verbal IQ of 76, performance IQ of 76, and a full scale IQ of 75. The doctor noted no signs of a psychotic disorder or significant brain dysfunction. Tr. 124. Dr. Wright diagnosed borderline intellectual functioning and emotionally unstable personality disorder. Dr. Wright noted that plaintiff was highly motivated to succeed in life, but also prone to become emotionally upset, including self-directed anger, when he failed to achieve his idealistic goals. Dr. Wright found that plaintiff's "very excellent" evaluation by the Vocational Rehabilitation Service indicated that plaintiff was capable of "certain levels of work." Finally, Dr. Wright recommended outpatient therapy or counseling to deal with plaintiff's social adjustment and nonacceptance of himself. Tr. 125.

In a work activity report completed on August 18, 1986, plaintiff stated that he had spent the summer of 1986 doing odd jobs like mowing lawns, hauling hay and

alfalfa, and cutting weeds. Tr. 156. Richard Classen, M.D., completed a questionnaire on August 28, 1986, in which he stated that he believed plaintiff would do well in a minimally supervised job of limited responsibility. Tr. 129.

On October 6, 1986, plaintiff underwent screening which revealed a profound hearing loss in his left ear and a mild hearing loss in his right ear. The examiner indicated that plaintiff should avoid a job which required hearing acuity. Tr. 175. In a letter dated October 22, 1986, Monte L. Allen, M.D., wrote that plaintiff had experienced difficulty hearing out of his left ear since childhood. The doctor recommended against a hearing aid because of the near normal hearing in plaintiff's right ear and also because of his poor auditory discrimination. Tr. 170.

Mary Hamer, a work adjustment coordinator at the Occupational Center of Central Kansas, Inc., reported on November 13, 1986, that plaintiff completed forty days of work adjustment training on November 13, 1986. During his training, plaintiff demonstrated good motivation and eagerness to work, but also exhibited a low level of self-confidence. Hamer noted that a major concern was plaintiff's difficulty with following instructions. She said that plaintiff was slow to learn jobs and required extensive training time, regardless of whether the job had simple or complex instructions. Plaintiff demonstrated good reading skills during job readiness training, and plaintiff was working on his interviewing techniques. Tr. 134.

On December 9, 1986, plaintiff finished his work adjustment training. Hamer listed plaintiff's assets as: quality, speed, personal appearance/hygiene, and positive work attitude. She listed plaintiff's liabilities as: limited ability to process instructions, difficulty in orienting to work environment, inability to consistently retain the sequence of job routines, and interview skills. She noted that plaintiff required a very routine, structured work environment. While doing custodial work with the custodial crew, plaintiff easily became lost in the various stores or forgot his routine from day to day. She recommended that plaintiff be referred for sheltered placement. Tr. 136–37.

A report of contact dated February 3, 1987, stated that plaintiff was undergoing a four week training program at Northview Developmental Services in Newton, Kansas. Tr. 152–53. In an April 1, 1987 summary of a meeting to discuss plaintiff's progress at Northview, Lisa Ghere, a case management intern, stated that plaintiff's major strengths were staying with the job, being interested in his work, and being reliable and dependable. She noted that plaintiff needed to be more vocal in asking for instructions and help and needed supervision in being reinstructed on jobs. Tr. 182.

In a questionnaire dated May 11, 1987, Dr. Wright stated that plaintiff had a limited capacity for carrying out instructions in a work setting. Dr. Wright thought that plaintiff might experience problems dealing with supervisors, co-workers, and work pressure due to his emotional instability. Dr. Wright found that plaintiff's impairments prevented him from performing any substantial gainful employment and that his prognosis was very guarded. Dr. Wright found plaintiff to be severely impaired and stated that for the foreseeable future, plaintiff could probably work only in a sheltered workshop. Tr. 184–88.

In a vocational assessment evaluation report dated July 15, 1987, Tom Bridges, a case manager, stated that plaintiff would do well in a sheltered workshop setting where he could be closely supervised and receive repetitive social and vocational training. Bridges concluded that plaintiff had many well developed vocational skills, the potential to develop more, and that with several years of sheltered work, job training, and schooling, plaintiff could prepare for community placement. Tr. 200–05.

Harold D. Converse, Ed.D., a psychological consultant with Northview Developmental Services, stated in a questionnaire dated November 11, 1987, that plaintiff suffered from an emotionally unstable personality disorder and that plaintiff's prognosis was very guarded. Dr. Converse stated that

plaintiff had a limited capacity to carry out instructions in a work setting and had a tendency to leave the job if stressed. He thought that few employers would be willing to hire plaintiff because of his immature work habits and lack of social adaptability. Dr. Converse indicated that plaintiff would be able to work only in a sheltered workshop under the supervision of trained supervisors. Tr. 207–11.

Connie Cornelson, plaintiff's social worker, wrote in a letter dated November 11, 1987, that plaintiff's difficulty with social situations prevented him from being competitively employed. Tr. 212. Glen Seaton, plaintiff's plant supervisor at Associated Milk Producers, stated in an undated statement that during his last two years on the job, plaintiff suffered a serious decline in his ability to work. Seaton stated that he kept plaintiff on the payroll as long as he did because Seaton was concerned that plaintiff would not be able to find another job. Seaton stated that plaintiff became unable to follow simple instructions or perform simple tasks and that plaintiff required too much supervision. Further, Seaton was afraid he would injure himself. Tr. 169.

At the hearing on June 18, 1987, plaintiff described his training and his job with Associated Milk producers. Tr. 51–57. Plaintiff's father testified that plaintiff forgot instructions easily and that plaintiff's memory had gotten worse. Tr. 61–63. Plaintiff's father and brother noted a decline in plaintiff's ability to function during the last few years. Tr. 63 (father), 69–70, 74–76 (brother). Plaintiff's father and mother testified that plaintiff managed to do as well as he did at the milk plant because he had help from coworkers. Tr. 63 (father), 67 (mother).

The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive ..." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420,

1427, 28 L.Ed.2d 842 (1971). It is not the duty of the court to reweigh the evidence. *Garrett v. Califano,* 460 F.Supp. 888, 890 (D.Kan.1978); *Manigan v. Califano,* 453 F.Supp. 1080, 1086 (D.Kan.1978). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. at 1428. This court cannot affirm the Secretary's decision by isolating a few facts and calling them "substantial evidence." *Cline v. Califano,* No. 78–4166 (D.Kan., *unpublished,* August 31, 1979). It is the court's duty to scrutinize the entire record to determine whether the Secretary's conclusions are rational. *Keef v. Weinberger,* 404 F.Supp. 1193 (D.Kan. 1975). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894 (10th Cir.1965).

The Secretary has developed a five-step process to be used in evaluating disability claims for disability insurance benefits. *See* 20 C.F.R. § 404.1520. An additional rule applies in cases of mental impairments. *Id.* § 404.1520a. At step 1, the ALJ found that the plaintiff was not engaged in substantial gainful activity. Tr. 20. At step 2, to determine the severity of plaintiff's impairments, the ALJ completed the standard form required by 20 C.F.R. § 404.1520a(d). Tr. 22–30. The ALJ found plaintiff to be suffering from mental retardation and a personality disorder. Tr. 26–27. The degree of limitation found by the ALJ met the severity requirements of step 2. Tr. 29; *see* 20 C.F.R. § 404.1520a(c)(1). At step 3, however, plaintiff's mental impairments did not meet or equal a listed mental disorder. Tr. 29; *see* 20 C.F.R. § 404.1520a(c)(2).

█ At this point, the regulations require the Secretary to do a residual functional capacity (RFC) assessment. 20 C.F.R. § 404.1520a(c)(3). At step 4, the ALJ determined that the plaintiff maintained the RFC to perform a wide range of routine, repetitive work, and could therefore perform the work he had performed in the

past. Tr. 19, 21. The ALJ thus concluded that plaintiff was not disabled. Tr. 21.

At the hearing stage, the responsibility for determining RFC rests with the ALJ. 20 C.F.R. § 404.1546. In evaluating RFC when a claimant suffers from mental impairments, the regulations require the ALJ to consider factors such as the claimant's ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers, and work pressures. *Id.* § 404.1545(c). The ALJ did not discuss or analyze these factors in his decision. The ALJ has offered no explanation of how he reached his RFC decision. This error requires that the action be remanded to allow the ALJ to further develop the record.

Additionally, the Secretary has ignored the evidence as a whole and, instead, has selectively abstracted pieces of evidence favorable to his position. *See Claassen v. Heckler*, 600 F.Supp. 1507, 1511 (D.Kan. 1985). The ALJ indicated that plaintiff "experiences some personality problems." Tr. 18. The ALJ failed to mention the diagnoses of Dr. Wright and Dr. Converse, two psychologists, that plaintiff suffers from an emotionally unstable personality disorder. Tr. 125, 207. The ALJ instead placed great reliance on the opinion of Dr. Classen (a medical doctor), who indicated that plaintiff could take care of himself and that with a minimally supervised job of limited responsibility, he would do well. Tr. 20. The ALJ's decision lists several psychological impairments from which plaintiff does not suffer (e.g., depression, psychosis, Tr. 19), while failing to mention the problems arising from plaintiff's personality disorder.

The ALJ relied on plaintiff's past work record to establish that plaintiff could continue to work. The record includes testimony from plaintiff's family members, who stated that plaintiff's condition had been deteriorating for some time prior to his termination from Associated Milk Producers. The ALJ made no credibility findings; rather, it appears that he simply disregarded the family's testimony. While the ALJ did note that plaintiff's employer was afraid that plaintiff would hurt himself, Tr. 18, the ALJ did not mention that plaintiff's employer also stated that plaintiff was no longer capable of doing the job.

The Secretary argues that there is no objective medical basis for plaintiff's alleged deterioration in mental condition over the past few years. The Secretary argues that plaintiff's intelligence level could not have fallen recently, since plaintiff has been borderline mentally retarded all his life. The Secretary's position fails to take into consideration the subjective evidence of record, which must be considered in cases of mental impairments. *See Hawkins v. Heckler*, 600 F.Supp. 832, 837 (D.Kan.1985). Further, the Secretary has disregarded the objective medical evidence of Dr. Wright and Dr. Converse, that plaintiff suffers from an emotionally unstable personality disorder, in addition to mental retardation.

■ The Secretary argues that he is entitled to disregard Dr. Wright's statement that plaintiff could work only in a sheltered workshop, Tr. 185, because that statement conflicts with Dr. Wright's earlier assessment that plaintiff was capable of performing "certain levels of work." Tr. 125. These statements are not inconsistent, since Dr. Wright never specified what he meant by "certain levels of work" in his earlier assessment. Dr. Wright never equated "certain levels of work" with substantial gainful activity. Even if these two assessments are inconsistent, the later assessment would indicate Dr. Wright's opinion that plaintiff's condition had worsened. The Secretary erred in disregarding Dr. Wright's later assessment of plaintiff's condition.

■ After a thorough review of the record, the court concludes that the Secretary erred at step 4 of the sequential evaluation process. The ALJ's finding that plaintiff was capable of performing his past work is not supported by substantial evidence. Since the claimant still bears the burden of proof at this step, *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 2294 n. 5, 96 L.Ed.2d 119 (1987), the appropriate relief is to remand to the Secretary to

resume consideration of the claim. *See Benskin v. Bowen*, 830 F.2d 878, 885 n. 2 (8th Cir.1987). The Secretary will then bear the burden of proof at step 5 to determine whether the claimant has the RFC to perform other work in the national economy, given his age, education, and work experience. *Bowen v. Yuckert*, 107 S.Ct. at 2291, 2294 n. 5. Since the Secretary has not yet had the opportunity to make the factual findings necessary to the step 5 determination, it would be premature for the court to grant plaintiff's motion for summary judgment.

IT IS BY THE COURT THEREFORE ORDERED that the defendant's motion to affirm the decision of the Secretary is hereby denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is hereby denied.

IT IS FURTHER ORDERED that the decision of the Secretary is reversed and the case is hereby remanded to the Secretary for further proceedings consistent with this opinion and order.