Wendy Dunn v. SSA                    CV-99-591-B    12/10/99

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE


**WENDY DUNN**

   v.                                Civil No. 98-591-B

**KENNETH S. APFEL, Commissioner,**
**Social Security Administration**


### MEMORANDUM AND ORDER


Wendy Dunn applied for disability insurance benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI on October 21, 1994, alleging that she had been unable to work due to disability since September 11, 1994.[1] After the Social Security Administration ("SSA") denied her applications initially and on reconsideration, Dunn requested a hearing before an Administrative Law Judge ("ALJ"). ALJ Thomas H. Fallon held

---

[1] Dunn filed prior applications under Title II and Title XVI on March 10, 1989. These applications were denied by the Social Security Administration and subsequently by a decision of an ALJ rendered on May 18, 1990. Dunn requested review of the ALJ's decision by the Appeals Council, which denied her request on January 16, 1991. In his September 21, 1996 decision, ALJ Fallon rejected Dunn's request to reopen the earlier applications. See Tr. at 25-6. ("Tr." refers to the official transcript of the record submitted to the Court by the Social Security Administration in connection with this case.) Dunn has not challenged the ALJ's denial of her request to reopen the earlier applications.

hearings on September 11, 1995 and August 20, 1996 and issued a decision denying Dunn's application on September 21, 1996. In his decision, the ALJ found that Dunn retained the residual functional capacity ("RFC") to perform her past relevant work, and therefore that she was not "disabled" under the terms of the Social Security Act. The ALJ also found that Dunn's claimed mental impairment was non-severe and did not limit her ability to perform basic work activities as long as she took appropriate medication. On July 1, 1998, the Appeals Council denied Dunn's request for review, rendering the ALJ's decision the final decision of the Commissioner of the SSA.

Dunn brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1994), seeking review of the Commissioner's decision denying her claim for benefits. Dunn claims that the Commissioner's decision should be reversed because: (1) the ALJ did not properly evaluate the evidence of her mental impairment; (2) the ALJ did not properly evaluate her subjective complaints of pain; and (3) the ALJ's decision that Dunn had the RFC to perform her past relevant work was not based on substantial evidence. Because I agree with the first of these claims, I vacate the ALJ's decision and remand for further

proceedings.[2]

## I.  <u>**STATEMENT OF FACTS**</u>[3]

Wendy Dunn was 28 years old when she applied for benefits. She has an eleventh-grade education and speaks English.  At various times between 1983 to 1994, Dunn worked as a cashier, a waitress, a restaurant shift supervisor, and a manager in a retail pet store.  <u>See</u> Tr. at 26, 65, 66, 81-3, 116-17, 280.  She currently lives in her home with her husband and two children.

Dunn suffers from neurofibromatosis,[4] a condition that first

---

[2]  Although I render no opinion on the merits of Dunn's other claims on appeal, on remand the ALJ should thoroughly evaluate the credibility of Dunn's pain complaints in light of all the evidence that relates to any of the following factors: (1) Dunn's daily activities; (2) the location, duration, frequency, and intensity of Dunn's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any pain medications Dunn has taken; (5) any non-medication forms of treatment for pain relief that Dunn has received; (6) any functional restrictions; and (7) any other relevant factors.  <u>See</u> 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (1999); <u>Avery v. Secretary of Health and Human Servs.</u>, 797 F.2d 19, 29 (1st Cir. 1986).

[3]  Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts submitted by the parties.

[4]  Neurofibromatosis is "a familial condition characterized by developmental changes in the nervous system, muscles, bones, and skin and marked superficially by the formation of multiple pedunculated soft tumors . . . distributed over the entire body associated with areas of pigmentation."  <u>Dorland's Illustrated Medical Dictionary</u> 1129 (28th ed. 1994).

began to manifest itself in 1982. In April 1986, she underwent exploratory surgery on a mass located in her right brachial plexus region. See id. at 168, 178, 186, 190. Dr. Merwyn Bagan, the surgeon who performed the procedure, determined that the mass was a neurofibroma, or tumor, that could not be removed. See id. at 178, 186-87, 190. At the time of the surgery, Dunn did not suffer from any neurological deficits. Since that time, several MRIs have revealed no enlargement of the tumor. See id. at 180-81, 224, 318, 326, 332, 356. Dunn has, however, complained of pain in her right arm that worsens with activity.

In May 1989, Dunn was examined at Massachusetts General Hospital ("MGH") by Dr. Robert L. Martuza. Dr. Martuza found that Dunn had reasonable function of her right arm, but that she had some weakness in the intrinsic muscles and some decrease in pinprick sensation on her fingers. In June of the same year, Dr. Homer Lawrence completed a residual functional capacity assessment in connection with Dunn's prior application for benefits.[5] See id. at 166-68. After reviewing her medical records, Dr. Lawrence concluded that Dunn was capable of

_____

[5] The parties' joint statement of material facts states that Dr. Lawrence examined Dunn. However, the record itself suggests that Dr. Lawrence performed an evaluation based on a review of Dunn's medical records. See Tr. at 166-70.

-4-

performing light work with some limitations on the use of her right arm. He added that there had been "no 12-month closed period of disability."

Dr. David Smith examined Dunn at MGH in February 1990. With respect to Dunn's neurofibromatosis, Dr. Smith found that there had been no sensory deficit progression, no progression in symptoms, and no enlargement of the mass at the base of Dunn's neck. Dr. Smith found that Dunn's wrist muscles were 4/5, that her muscle groups in all other extremities were 5/5, and that there was no drift or atrophy. Dunn's gait and station were normal, there was no ataxia, and a sensory exam for vibration was intact. A CT scan confirmed that there had been no progression of the neurofibroma in Dunn's right brachial plexus area since 1984.

Dr. Smith also noted that Dunn complained of chronic headaches that occurred approximately two to three times per week and often lasted more than one day at a time. See id. at 220. According to Dr. Smith's notes, Dunn treated these headaches with Ibuprophen, which provided minimal relief. See id. Dr. Smith concluded that the headaches were stress-related. Dunn also complained of difficulty gaining weight. See id. Dr. Smith noted that she weighed 87 pounds, stood 4' 11' tall, and ate

three full meals a day plus high-caloric snacks.

In a report dated March 29, 1994, Dr. Philip Wolf, Dunn's treating neurologist, noted that she had continued complaints of pain in her neck, right shoulder, chest, and right leg. See id. at 315. Dr. Wolf noted that Dunn had attributed a recent car accident to problems that she was experiencing with her right leg and foot. See id. Dr. Wolf related Dunn's complaints of increased tingling during standing and increased difficulty with walking or sitting in one position for too long. See id. He reported that both of Dunn's knees had a tendency to give out. He also noted that Dunn took Prozac and was using Tylenol to treat headaches about four to five times a week. See id.

In August 1994, Dunn was involved in a second motor vehicle accident in which she was the driver. An emergency room physician noted that she complained of neck discomfort after the accident, but that her motor function was normal. See id. at 322. The physician diagnosed neck strain and discharged her; cervical x-rays were negative.

In February 1995, Dunn was examined at the request of New Hampshire Disability Determination Service ("DDS") by neurologist Mildred LaFontaine, M.D. Dunn complained to Dr. LaFontaine of leg pain, difficulty with her knees, and pain and weakness in her

right arm.  See id. at 327.  She told Dr. LaFontaine that she always avoided lifting at work.  She also complained of frequent headaches, which she generally treated with Tylenol.  See id. Dunn reported a history of depression, for which she had taken Paxil[6] until she lost her health insurance coverage.

Dr. LaFontaine's examination yielded the following results: all of Dunn's joints, including her right shoulder, elbow, and hand joints, appeared normal.  See id. at 328.  Dunn had no obvious spine deformity, her neck was supple, and she had an "excellent" range of motion in her lumbar spine.  There was some effort-related weakness in all groups of the right upper extremity and lower extremity in the range of 4 to 4+/5.  Tone appeared normal, gait and station were normal, and reflexes were brisk.

Based on the examination, Dr. LaFontaine concluded that Dunn did "not appear to have any obvious neurologic impairment despite her neurocutaneous[7] disease."  Id. at 328.  The doctor added, "I am unable to demonstrate objective weakness, reflex impairment,

_____

[6]  Paxil is an antidepressant medication.  See Physicians' Desk Reference 2851 (52nd ed. 1998).

[7]  Neurocutaneous means "pertaining to the nerves and the skin; pertaining to the cutaneous nerves."  Dorland's Illustrated Medical Dictionary 1128 (28th ed. 1994).

or sensory loss." In March 1995, after reviewing records of Dunn's past MRIs and related medical reports, Dr. LaFontaine stated that the MRIs showed no involvement of the fibrous mass with any adjacent structures, that there were no brain abnormalities, and that there were no lumbar abnormalities. Dr. LaFontaine concluded, "I do not see any evidence of neurological impairment at this time," and found "no evidence that [Dunn was] disabled from light duty work."

In May 1995, DDS sent Dunn for an orthopedic evaluation by William Kilgus, M.D. According to Dr. Kilgus's report, Dunn complained of occasional locking of the knee joints. Dr. Kilgus found that knee x-rays showed no abnormalities and no evidence of deterioration. Clinical examination revealed that Dunn was a well-developed, well-nourished female in no acute distress. The doctor observed that Dunn walked with a good gait and did not list to either side. Examination of her knee joints showed a good range of motion, only mild crepitus and no instability. Dunn's quadriceps muscles were weakened bilaterally, and there was no joint effusion. Dr. Kilgus diagnosed Dunn with "mild chondromacia of the patellae bilaterally." Id. at 336. He characterized her overall prognosis as "good," and recommended an intensive course in physical therapy. The doctor concluded that

Dunn had a full-time work capacity, but recommended that she avoid work that required prolonged sitting or standing.

In November 1995, Dunn referred herself to the Twin Rivers Counseling Center, where her presenting problems were "'[m]ood swings,'" "[r]apid and frequent shifts in affect," and "[i]rritability set off by 'little things.'" Id. at 338. Her case history noted that these problems began six or seven years earlier. Dunn reported that she lost her management position after several of her employees complained about her behavior. A mental status exam revealed that Dunn's mood seemed depressed with "some neurovegetative signs of depression," such as "[a]nhedonia[8], lethargy and feelings of helplessness." Id. at 339. According to the center's intake report, Dunn's sleep and appetite patterns were disturbed, she had a severely negative self-image, she experienced marked shifts in affect with irritability and explosiveness at times, she denied having hallucinations, and she demonstrated no indications of thought disorder. See id. at 339-40. The center's report also stated that Dunn seemed to have a negative self-image, that insight and judgment were present, and that her intelligence appeared to be

---

[8] Anhedonia is "the absence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedman's Medical Dictionary 85 (25th ed. 1990).

in the average range.  The report listed Dunn's coping ability and personal resources (e.g., family, agencies, and significant others) as strengths, and noted that she continued to care for her children adequately.

Based on these observations, Dunn was diagnosed as suffering from a recurrent major depressive disorder.  She paid three additional visits to the counseling center during November 1995, during which she reported some improvement, although she had some trouble practicing the self-soothing techniques recommended by the clinician.

At about the same time that she was visiting the counseling center, Dunn was examined by psychiatrist Michael Evans, M.D., at the request of DDS.[9]  Dunn told Dr. Evans that she was uncomfortable sitting or standing for prolonged periods of time, that she had been crying for no apparent reason for years, that she was "moody," that she frequently became angry and frustrated with people.  See id. at 343-44.  Dunn also told Dr. Evans about several occasions when she had lost her temper during the previous summer.  In the first episode, Dunn became so upset with

_____

[9]  Although the parties' joint statement of material facts states that DDS requested Dr. Evans to evaluate Dunn's mental status in December 1995, the doctor's medical report indicates that it was dictated on November 8, 1995 and transcribed on the following day.  See Tr. at 342, 346.

-10-

her husband during an argument that she attempted to hit him and the family dog with her van. In the second incident, Dunn used a knife to threaten her brother, who had come to live with the family during the summer. Dunn informed Dr. Evans that she felt that she was totally disabled due to chronic pain and weakness related to her disease. The doctor noted, however, that neurologic findings were not consistent with any progressive disorder.

After examining Dunn, Dr. Evans noted that her affect was "mildly sad," but that she did not show significant psychomotor retardation or significant affective change. The doctor reported that Dunn denied having hallucinations and suicidal or homicidal thoughts, that she was oriented times three, that her short-term and instantaneous memory was intact, and that she could perform simple mathematics adequately. Based on the examination, Dr. Evans diagnosed dysthymia[10] (Axis I); personality disorder, not otherwise specified (Axis II); and neurofibromatosis, nuerofibroma of the right axilla (Axis III). See id. at 345.

---

[10] Dysthymia is "a mood disorder characterized by depressed feeling . . . and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." Dorland's Illustrated Medical Dictionary 519 (28th ed. 1994).

The doctor noted that Dunn took care of her house, drove a car, managed her children, shopped, cooked, paid her bills, and maintained her residence, although this characterization of Dunn's activities conflicts in some respects with those she reported in her applications for benefits.[11] Dr. Evans concluded that Dunn could complete tasks, that she could understand and follow simple written and oral instructions, and that she had difficulty adapting to work situations. The doctor also noted that Dunn was receiving no treatment at that time.

Dr. Evans completed a standard form assessing Dunn's mental residual functional capacity. On that form, the doctor concluded that Dunn had good ability to follow work rules, to use judgement, to function independently, and to maintain attention/concentration. Dunn also had good ability to understand, remember and carry out complex instructions; unlimited or very good ability to carry out non-complex and simple job instructions; very good ability to maintain her

---

[11] In her March 1989 application, Dunn stated that she cleaned and cooked meals, but that her husband did the shopping. See Tr. at 148. In an assessment of activities of daily life submitted to DDS in November 1994 as part of her current application, Dunn reported that she prepared meals; that her brother helped her with food shopping because she couldn't push the shopping cart or lift the food into or out of her car; and that various family members assisted her with household chores such as cleaning and laundry. See id. at 284-85.

personal appearance; and good ability to demonstrate reliability. She had only fair ability, however, to relate to coworkers, to deal with the public, to interact with supervisors, to deal with stress at work, to behave in an emotionally stable manner, and to relate predictably in social situations. Dr. Evans noted that during the evaluation Dunn reported a long history of inability to manage anger and poor tolerance of frustration, as well as more recent difficulties with customers and fellow employees at the pet store where she was last employed. He also noted that Dunn had significant problems controlling her anger, had great difficulty making social and emotional adjustments, and had difficulty forming social relationships. See id. at 350.

On November 22, 1995, Dunn saw Dr. Lawrence Rush, whose speciality is internal medicine. See id. at 352, 355. Dunn complained to Dr. Rush of continuing right arm pain and headaches. See id. at 352. Dunn told Dr. Rush that in the past her headaches occurred approximately once per week and were treatable with Tylenol, but that during the previously year and a half they had worsened to the point of occurring three to five times per week. See id. Dunn told the doctor that these more frequent headaches were not ameliorated by Tylenol, but that they were alleviated in some degree by Naprosyn, which she had taken

-13-

when she still had health insurance.  See id.  Dunn reported that she was taking Prozac for "mood swings," and that she sometimes had "crying attacks" and got angry or upset with her children. Id. at 353.  Dunn also complained of knee and leg pain.  See id.

Dr. Rush found Dunn's vital signs and physical examination to be essentially unremarkable, other than the symptoms of her neurofibromatosis and "perhaps a little bit of weakness in the right upper extremity."  Id. at 353-54.  The doctor noted that Dunn lacked access to medical care because she had no health insurance since she stopped working in September 1994.  He also recommended that Dunn have a complete evaluation by a neurologist.  See id. at 354.

In February 1996, Dunn was evaluated by neurologist Alexander G. Reeves of the Hitchcock Clinic at the request of DDS.  Dr. Reeves found that Dunn's straight leg raising was negative.  He noted that MRIs of Dunn's spine demonstrated no neurofibromatosis of the central axis, and that an MRI of her brain did not demonstrate and any posterior fossa or other masses.  See id. at 356.  Dunn's motor screen was normal, her sensory screen was normal, her reflexes were 2+ and symmetrical in the upper extremities and 3+ and brisk at the knees and ankles.  Dr. Reeves noted that Dunn had "superficial

neurofibromatosis and some involvement of her nerve trunks which are symptomatic and, in particular, at the right brachial plexus." Id. He concluded that her symptoms were "disabling," but that her neurological examination was "within normal limits." Id. at 356-57. The doctor found that "objectively" Dunn had "no neurological disability," but that she did have "subjective disability . . . which is probably caused by neurofibromas impinging on peripheral nerve branches." Id. at 357.

At the administrative hearings held before the ALJ, Dunn and several other witnesses testified to the effects of Dunn's alleged mental impairment on her ability to function in daily life and on the job. At the September 11, 1995 hearing, Dunn testified that her inability to handle stress had led to the incidents of actual and/or threatened violence against her husband and brother that she subsequently described to Dr. Evans. See id. at 86-88. Dunn also related an episode in which she had lost control of her temper while working as a manager in a pet store and had to leave the store. See id. at 88-89. Dunn's husband testified to the difficulties that Dunn's emotional or mental problems had caused his wife both at work and at home. See id. at 93-95, 97-98. Cheryl Ackerson, who had worked with Dunn at the pet store, described how Dunn's emotional outbursts

and inability to handle stress had negatively effected her job performance. See id. at 99-103. At the second hearing, held before the ALJ on August 20, 1996, Dunn's husband testified that Dunn's "tremendous fear" prevented her from performing basic life activities such as running errands. See id. at 136.

## II. STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); 42 U.S.C. § 405(g). The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" Id. (quoting

Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ has misapplied the law or has failed to provide a fair hearing, however, deference to the ALJ's decision is not appropriate, and remand for further development of the record may be necessary. See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The [ALJ's] conclusions of law are reviewable by this court."). I apply these standards in reviewing Dunn's case on appeal.

## III.  **DISCUSSION**

The Social Security Act defines "disability" for the purposes of both Title II and Title XVI as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (1994). In evaluating whether a claimant is disabled due to a physical or mental impairment, an ALJ's analysis is governed by a five-step sequential evaluation

process.[12]  See 20 C.F.R. §§ 404.1520, 416.920 (1999).  The
Commissioner has provided an additional evaluation process that
an ALJ must apply when, as in the present case, a claimant
alleges a mental impairment.  See 20 C.F.R. §§ 404.1520a,
416.920a (1999).  To determine the severity of a mental
impairment, an ALJ must rate the degree of functional loss in
four areas that the SSA has identified as essential to work: 1)
activities of daily living; 2) social functioning; 3)
concentration, persistence, or pace; and 4) deterioration or
decompensation in work or work-like settings.  See 20 C.F.R. §§
404.1520a(b)(3), 416.920a(b)(3); Figueroa-Rodriguez v. Secretary
of Health and Human Servs., 845 F.2d 370, 372 (1st Cir. 1988)
(per curiam).  Absent significant evidence to the contrary, a
claimant's mental impairment can be presumed to be non-severe if
the degree of limitation caused by the impairment is "none" or
"slight" in the first and second of these essential areas,
"never" or "seldom" in the third area, and "never" in the fourth

_____

[12]  In applying this analysis, the ALJ is required to
determine: (1) whether the claimant is presently engaged in
substantial gainful activity; (2) whether the claimant has a
severe impairment; (3) whether the impairment meets or equals a
listed impairment; (4) whether the impairment prevents the
claimant from performing past relevant work; and (5) whether the
impairment prevents the claimant from doing any other work.  See
20 C.F.R. §§ 404.1520, 416.920 (1999).

area.  See 20 C.F.R. §§ 404.1520a(c)(1), 416.920(c)(1); Figueroa-Rodriquez, 845 F.2d at 372.

In order to determine whether a claimant is disabled, an ALJ must consider and evaluate all evidence, whether objective or subjective, that is relevant to the claim.  See Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).  The SSA's regulations define "evidence" as "anything [the claimant] or anyone else submits [to SSA] or that [SSA] obtain[s] that relates to [the] claim."  20 C.F.R. §§ 404.1512(b), 416.912(b) (1999).  Relevant evidence may include, but is not limited to, the following types of information: objective medical evidence; other evidence from medical sources; statements about the claimant's impairment(s) made by the claimant or others, including testimony offered at administrative hearings; and information from other sources, such as public and private social welfare agencies, non-medical sources, and other practitioners.  See id.; see also 20 C.F.R. §§ 404.1513(e), 404.1528(a), 416.913(e), 416.928(a) (1999).  If any of the evidence in a case record is inconsistent, the ALJ must weigh the conflicting evidence and decide which evidence to credit.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (1999).

In the present case, the ALJ's written decision indicates

that he failed to consider and weigh the full range of evidence relevant to Dunn's alleged mental impairment. The ALJ's brief discussion of Dunn's mental impairment refers only to the psychiatric consultative evaluation performed by Dr. Evans. See Tr. at 27. The decision makes no mention of the other relevant evidence of mental impairment contained in the case record, such as the records from the Twin Rivers Counseling Center and the testimony offered at the administrative hearings by Dunn, her husband, and her coworker, in which the witnesses described Dunn's mental impairment and its negative effects on her ability to function.

Under SSA regulations, both the counseling center's records and the hearing testimony constitute relevant, non-medical evidence of mental impairment that the ALJ should have considered. While a community counseling center does not qualify as an "acceptable medical source" under the regulations, see 20 C.F.R. §§ 404.1513(a), 416.913(a), the SSA has expressly provided that information "provided by programs such as community health centers" is relevant documentation of a claimant's ability to function and to tolerate stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.00D. In this case, the center's evaluation of Dunn's mental status was especially relevant because Dunn visited

the center multiple times and because it was the only source that provided treatment, as distinguished from an evaluation, for Dunn's alleged mental impairment. The regulations also provide that the effects of a claimed mental impairment may be demonstrated by information provided by family members or others "who have knowledge of an individual's functioning." Id. The testimony offered by Dunn's husband and co-worker clearly constitutes such information.[13] Finally, while Dunn's subjective testimony that she suffered symptoms of mental impairment is not sufficient in itself to establish the existence of a mental impairment, it is probative evidence that the ALJ should have assessed for credibility. See 20 C.F.R. §§ 404.1528(a), 416.928(a); 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.00B; Gray v. Heckler, 760 F.2d 369, 374 (1st Cir. 1985) (per curiam); Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir. 1975) (per curiam).

While the ALJ was free to discredit the evidence provided by

---

[13] An SSA Program Policy Statement, which deals with the assessment of residual functional capacity for claimants with mental impairments, similarly provides that "[t]o arrive at an overall assessment of the effects of mental impairment, relevant, reliable information, obtained from third party sources such as social workers, . . . family members, and staff members of . . . mental health centers, and community centers, may be valuable." SSR 85-16, 1985 WL 56855, at *4 (1985) (emphasis added).

-21-

the counseling center and by witnesses at the hearings, he was not free to "simply ignore, as he did here, the 'body of evidence opposed to [his] view.'" Diaz v. Secretary of Health and Human Servs., 791 F. Supp. 905, 912 (D.P.R. 1992) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); see also Dedis v. Chater, 956 F. Supp. 45, 51 (D. Mass. 1997) (same). An ALJ is under no obligation "to expressly refer to each document in the record, piece-by-piece." Rodriguez v. Secretary of Health and Human Servs., 915 F.2d 1557, No. 90-1039, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) (table, text available on Westlaw); see also NLRB v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999) (enforcing administrative order in labor context); Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony . . . ."). However, for a reviewing court to be satisfied that an ALJ's finding was supported by substantial evidence, that finding "'must take into account whatever in the record fairly detracts from its weight.'" Diaz, 791 F. Supp. at 912 (quoting Universal Camera, 340 U.S. at 488). In the present case, because the ALJ's decision failed to even mention -- let alone evaluate -- evidence that may have favored Dunn's claim of mental impairment, it is impossible to

determine whether this evidence was implicitly discredited or instead was simply overlooked.[14]  See Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984); Cotter, 642 F.2d at 705; Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998); see also Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (concluding that ALJ's decision was "fatally undermine[d]" by ALJ's failure to mention and evaluate testimony by claimant and family member).

In addition, the ALJ's decision affirmatively mischaracterized the evidence of mental impairment contained in the record.  The decision stated that "[t]here is no evidence in the case record of a psychiatric impairment other than dysthymia."  Tr. at 27.  This statement was inaccurate in that it denied the existence of evidence, such as the report from the Twin Rivers Counseling Center, suggesting that Dunn suffered from a major depressive disorder.  The ALJ may not selectively extract

---

[14]  The ALJ also found that "Dunn has not deteriorated or decompensated in a work or work-like setting," Tr. at 27, without acknowledging or explicitly discrediting testimony, offered at the September 11, 1995 administrative hearing, in which Dunn was described as suffering from decompensation in the work setting.  See id. at 88-89, 101-03.  Once again, while the ALJ may choose to discredit such testimony, the decision makes it impossible to determine whether this evidence was ignored or weighed and found not to be credible.

certain pieces of evidence from the record while simultaneously ignoring other, potentially contradictory, pieces of evidence. See Nguyen, 997 F. Supp. at 182; Miller v. Bowen, 703 F. Supp. 885, 889 (D. Kan. 1988); Claassen v. Heckler, 600 F. Supp. 1507, 1511 (D. Kan. 1985); Alvarez v. Califano, 483 F. Supp. 1284, 1285-86 (E.D. Pa. 1980).

The ALJ's apparent failure to weigh other relevant evidence of mental impairment is particularly troubling in this case because the ALJ found that Dunn's mental impairment was non-severe at the second step of the five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment should be considered non-severe only if it does not significantly limit a claimant's physical or mental ability to do basic work activities. See McDonald v. Secretary of Health and Human Servs., 795 F.2d 1118, 1121 n.3, 1124-25 (1st Cir. 1986); 20 C.F.R. §§ 404.1521(a), 416.921(a). Because the severity step is essentially a threshold requirement devised to screen out insubstantial claims, see Bowen v. Yuckert, 482 U.S. 137, 153 (1987); McDonald, 795 F.2d at 1124-25, an ALJ should take special care to evaluate all relevant evidence before finding an impairment nonsevere. In this case, I cannot ignore the possibility that the ALJ's failure to accurately assess all

relevant evidence of mental impairment at the severity stage led to a failure to properly consider the total limiting effects of Dunn's mental and physical impairments when determining her RFC and when deciding at step 4 that Dunn could perform her past relevant work. See 20 C.F.R. §§ 404.1523, 404.1545(e), 416.923, 416.945(e) (1999).

Finally, the ALJ's discussion of Dunn's mental impairment suffers from an internal contradiction that in itself indicates the need for further explication. The decision states that Dunn "has not undergone treatment" for what the ALJ concluded was a "dysthymic disorder." Tr. at 27. At the same time, however, the ALJ states that in the past Dunn has taken Prozac and Valium to successfully control her dysthymia. See Tr. at 27. Although the record contains references to Dunn's use of Prozac and other medications for depression, see id. at 286, 315, 327, 352, it does not provide a clear indication of when the medications were prescribed, who proscribed them, or whether they were successful in alleviating her symptoms. On remand, the ALJ may choose to seek additional evidence to address these issues.

## IV. CONCLUSION

The Social Security Act charges the ALJ with responsibility for judging credibility and resolving conflicting evidence. See

Irlanda Ortiz, 955 F.2d at 769.  While an ALJ's findings are conclusive when supported by substantial evidence, they are not conclusive "when derived by ignoring evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  When an ALJ "fail[s] to base his decision on the entire administrative record and evidence as a whole," there is good cause for remand. Ortiz v. Apfel, 55 F. Supp.2d 96, 100 (D.P.R. 1999); see also Nguyen, 997 F. Supp. at 182-83; Crosby v. Heckler, 638 F. Supp. 383, 385 (D. Mass. 1985).  Because the ALJ in this case reached his conclusion by ignoring and selectively extracting relevant evidence, and because his decision contains unexplained contradictions, I am unable to conclude that the decision is supported by substantial evidence.  Accordingly, I vacate the ALJ's decision and remand this case with instructions that, in reaching a new decision, the ALJ consider all evidence relevant to Dunn's mental impairment, developing additional evidence if he deems supplementation of the record to be necessary.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

December 10, 1999

cc:  Raymond Kelly, Esq.

David Broderick, Esq.